256 So.2d 32 (1971)
STATE of Florida, Appellant,
v.
Jimmy Jack HOLMES, Appellee.
STATE of Florida, Appellant,
v.
Jimmy Jack HOLMES and William Stafford Allison, Appellees.
STATE of Florida, Appellant,
v.
Jimmy Jack HOLMES and William Stafford Allison, Appellees.
Nos. 69-450 to 69-452.
District Court of Appeal of Florida, Second District.
December 10, 1971.
Rehearing Denied January 21, 1972.
E.J. Salcines, County Sol., and Robert H. Mackenzie, Asst. County Sol., Tampa, for appellant.
Mark Hawes and Britt Whitaker, Tampa, for appellees.
MANN, Judge.
This case presents one question of inordinate intricacy and one suggesting inordinate ingenuity of counsel. First the facts:
Shortly before two o'clock one wet morning Detective Cloud, responding to a reported breaking and entering, saw a car he believed to be Holmes' going "too fast for conditions," sliding around a corner and running with lights out. A chase ended in Holmes' front yard. Holmes got out of his car. He had a pistol in his hand. Cloud grabbed a shotgun, placed his microphone through the window and ordered Holmes to drop the pistol. Holmes didn't. Cloud cocked the shotgun. Holmes dropped the pistol. Holmes, Allison and Vess were arrested for possession of burglary *33 tools plainly visible in the back seat of the car.[1] Holmes was also charged with careless driving and possession by a felon of a firearm. The burglary tools were seized, and this appeal is taken from an order granting a motion to suppress this evidence.
The trial judge was requested to assign reasons but declined to do so.
Although only two possibilities are considered by appellant, it is conceivable that the trial judge did not credit the officer's testimony. He viewed the scene and heard evidence from a surveyor that the street jogged 114 feet, making it arguably impossible for Holmes to have driven as fast as Cloud said he did. We tend to discount this as a rational alternative, however, since the judge did not specifically determine that the officer was stretching the facts and the essential allegations of the traffic offense are not contradicted. True, Cloud testified on cross-examination that he thought Holmes was doing thirty or thirty-five miles per hour, but he wasn't charged with speeding. It is unrealistic to expect an officer to make precise estimates of speed under these circumstances. Cloud, alone in a car late at night, was following a man he thought to be a burglar. He also thought  rightly, as it turned out  that the man might be armed. His testimony on direct examination was that Holmes was driving too fast for the wet condition of the pavement, was skidding around corners and was driving with his lights out. Not one of these allegations is disputed by any witness, including Holmes and Allison, who testified. Cloud testified at first as though the jog in the street were slight, but admitted on cross-examination that it might be as much as a hundred feet. Skillful counsel made the most of the discrepancies in Cloud's testimony, but when we consider all the circumstances we doubt that the order was based on a finding that Cloud's testimony was essentially untrue.

I

When will a traffic arrest support seizure of evidence of serious crime in plain view after a motorist is stopped?
The question before us is not that in Chambers v. Maroney,[2] in which the Supreme Court of the United States upheld searches of occupants of vehicles where the officer had probable cause to arrest on the felony charge. Nor have we the question of a search which extends beyond limits appropriate to the traffic offense charged; e.g., the trunk of the car.[3] Nor is the case one in which a search is conducted without a warrant while the car and driver are in police custody and a warrant is obtainable.[4] Nor is it one in which the police, for their own protection against claims of missing property, have, in accordance with standing procedure, conducted an inventory of the contents of an automobile taken into custody.[5] It is the more common case of a seizure of plainly visible evidence of felony after a motorist is stopped for a traffic violation,[6] except that here the arresting officer was not a traffic officer.
It is frequently stated that "an arrest may not be used as a pretext to search for *34 evidence."[7]Pretext is the problem word. It is our dissatisfaction with it which causes us to devote more than ordinary attention to the question.
To focus attention on the question whether the arrest was a "pretext" for the seizure is to misdirect the court's attention to the motive of the arresting officer when, in our view, it is more appropriate to examine the conduct of the accused. This is a case in which the difference may be crucial. No one here pretends that Cloud was uninterested in arresting Holmes in connection with the reported burglary. Nor does anyone pretend that Cloud was making a traffic arrest to help another division of the police department. He thought the man in the car was Holmes. He suspected Holmes of burglary. Therefore to ask whether Cloud used the traffic arrest as a pretext[8] is virtually to invite the conclusion that he did.
If we suppose an unsuspected person arrested for a traffic violation of such gravity that any citizen would be stopped for it, can we deny that contraband in plain view of the officer may lawfully be seized? Suppose, on the other hand, an equally grave violation by a person suspected of more serious crime. Is he immune from lawful arrest? Certainly he should not be. Is he then immune from lawful seizure of the evidence of the serious crime if it is then in plain view? We think not, provided that the gravity of the traffic offense is such that any citizen would routinely be stopped for it if seen committing the offense by a traffic officer on routine patrol. The circumstance that the arrest is made by one not normally engaged in the enforcement of the traffic laws is a factor which may tend to discredit the claim that any citizen would be apprehended under the circumstances, but it is wrong to say that because the person arrested is suspected of serious crime a traffic offense will not subject him to detention, and evidence to seizure, merely because the arresting officer's motive is to secure evidence of the more serious offense.
We conclude that at the bottom of the pretextual arrest doctrine is an unarticulated application of Yick Wo v. Hopkins:[9] "Though the law itself be fair on its face, and impartial in appliance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." This interpretation of the Equal Protection Clause[10] suggests that the real evil of searches and seizures incident to a traffic arrest is not that the arrest is a pretext for the search, but that the arrest is one which would not have been made but for the motive of the arresting officer. The facts in this case suggest the strong possibility that the arrest was one which would have been made by a traffic officer on routine patrol, against any citizen driving as Holmes drove.
Measured by this standard, the person under suspicion acquires no immunity from seizure which would be denied the unsuspected citizen. Thus we avoid the nonsensical consequence of the logical extension of the pretextual arrest doctrine.[11]

*35 II

May the court take judicial notice of municipal traffic ordinances under the circumstances of this case?
Counsel's ingenious argument is that the order suppressing evidence is supported by the failure of the State to introduce at the hearing the Tampa ordinance forbidding careless driving. The cases suggest that Florida courts cannot take judicial notice of municipal ordinances. Yet we have looked through the records of several cases involving arrests on municipal traffic ordinances, and find none in which the State has proved, or the defense has demanded proof of, the ordinance. We find in our records no evidence that ordinances are being proved as facts on motions to suppress.
That courts of general jurisdiction do not notice municipal ordinances has become a reflexive incantation. Florida initially recognized the rule in Freeman v. State, 1882, 19 Fla. 552, and it has since been frequently recited.[12] The few courts undertaking an explanation of the rule beg the question: "The rationale of the rule as stated in some of the cases is that such ordinances and regulations stand upon the same footing as private laws, the laws of other states and of foreign countries, which must be averred and proven like other facts."[13] Explanations in secondary authority have also been deficient: "The reason for the rule is that municipal ordinances are regarded by courts of superior or general jurisdiction as private laws."[14] The private law rationale has been undercut by the enactment of the Uniform Proof of Statutes Act, Fla. Stat. § 92.01 (1969), F.S.A. providing that printed copies of acts, statutes and resolutions of the state legislature shall be admitted as sufficient evidence, whether of a public or private nature. Furthermore, the Uniform Judicial Notice of Foreign Law Act, Fla. Stat. § 92.031 (1967), F.S.A. requires every court in the state to notice the common law and statutes of every state, territory and other jurisdiction of the United States. We think that a Tampa judge, sitting on the Criminal Court of Record for Hillsborough County, who must take judicial notice of the statutes of Guam, may take judicial notice, in hearings on motions to suppress, of the ordinances of Tampa.
Prior to the enactment of the Uniform Judicial Notice of Foreign Law Act, when "foreign" law was treated as municipal ordinances are today, Wigmore observed: "The judges manipulate an esoteric logical dream-machine which has caused them to forget the world of reality."[15] On the specific problem of noticing municipal ordinances he noted with some exasperation:[16]

*36 Of course, these technical quiddities, in the reviewing Court's rulings, refusing to take judicial notice, mean little more than that counsel should have taken care to adduce formal proof of the law or ordinance at the trial below, or at least to have set it forth in the appellate brief.
But the curious layman will ask, In most of these cases, why did not the appellate Court send to the law library for the book and be done with the bother of looking up precedents to authorize and excuse not doing that? Or why not, in oral argument, take a recess, until counsel fetched the book and marked the page? Or even (!!!) why not call up both counsel by telephone and peremptorily order "habeas corpus istius libri"?
An obscure special act of the Florida legislature,[17] which we are compelled judicially to notice, has since 1951 authorized the City of Tampa to enact a code of ordinances. We know it exists, because we have had to deal with it.[18] The State, in its brief, quotes Section 36-60 of the Code of the City of Tampa, and in its reply brief asserts that the appellee should concede that it was read to the trial judge at the hearing, without objection, but the record is silent on the point. Section 36-60, which the appellee contends we cannot notice, is nearly identical to Fla. Stat. 186.9980 (1969), F.S.A., a section of the Model Traffic Ordinance for Municipalities, which Section 186.02 authorizes Florida cities to adopt by reference. We think there is great uniformity among our cities in their traffic ordinances. If the courts of our state are free to inquire into ordinances and accept them without formal proof, the administration of justice would be greatly simplified and the likelihood of the attainment of justice in any particular case will be enhanced.
Perusal of other files in which arrests by city police have served as the basis for seizures suggests that ordinances are in many places so conveniently codified that they are in fact judicially noticed without objection. We find no precedent forbidding judicial notice on motion to suppress. We think that the policy underlying the rule has largely disappeared, and there is in any event no harm in allowing proof upon demand where there is any question raised about the existence or text of the ordinance. In this case there does not appear to have been any opportunity given to prove the ordinance. Had there been any doubt, the trial judge need not have taken judicial notice without satisfactory proof. But it is not sound law to allow the technical deficiency in the record to stand as a basis for suppression of evidence after the hearing has closed.
In earlier times municipal ordinances were secreted in the files of city clerks. They were not easy to discover, and the requirement that their existence be proved corresponded with the necessity of those times. The most convincing reason for the rule is stated by Maguire, Weinstein, Chadbourn and Mansfield:[19] "There is no source to which the lawyer can turn for all local ordinances or even for all the ordinances in a single state. Particularly in the case of small municipalities there may be a single copy of the local regulations kept by one of the village officials." This is sound reasoning, but we do not believe it supports a blanket prohibition against notice of local ordinances. That courts are beginning to perceive this is illustrated by Kramer v. Board of County Commissioners, 1967, 248 Md. 27, 234 A.2d 589, n. 4: "When ordinances are bound in authoritative volumes which are readily available to the courts, it would seem reasonable that judicial notice might well be taken of such *37 ordinances." The erosion of the old rule is reflected in both the Model Code of Evidence 802(a) and the Uniform Rules of Evidence 9(2) (a). The comment to the Model Code indicates there is no reason why a judge should be prohibited from noticing such an ordinance, but that he need not do so if it is inconvenient.
In recent years the law has progressed greatly toward protection of the rights of accused persons. Correspondingly, there has been a marked retrenchment by appellate courts from the practice of reversing convictions for technical, non-prejudicial flaws in the record.
For the foregoing reasons we are of opinion that the trial judge, if he did not discredit the testimony, erroneously considered either that the arrest for careless driving was a pretext for seizure or that the State's case was technically deficient in that it failed to prove the careless driving ordinance as a fact.

III
What seems to us a more rational explanation of Cloud's stopping Holmes seems never to have been considered at all by the prosecutor or trial judge. We are an appellate court and should refrain from making judgments about matters of fact. Consequently we leave to the trial court the question whether Cloud was justified in detaining Holmes irrespective of grounds for arrest. We are prompted to wonder by the obvious fact that Cloud went after Holmes while responding to a burglary call. It is logical to assume that in some way Cloud thought Holmes was coming from the particular burglary in question. He said that he spotted Holmes as he entered the "area," but the record is not sufficiently specific to allow us to determine how close to the scene of the reported crime this chase began. Certainly a lot of factors combine to give a police officer authority to detain one walking[20] or riding[21] and inquire further about the reasons for his suspicion-arousing conduct. Proximity to the scene of a reported crime, reputation of a particular person for involvement in that type of crime, the officer's knowledge of the individual involved, conduct  like turning one's car lights out when a police car takes chase  which reasonably causes suspicion, all combine to suggest that Cloud may have been justified in stopping Holmes and detaining him momentarily. If this were true, the seizure of burglary tools in plain view would be unexceptionable.
The Constitution forbids unreasonable searches and seizures. It forbids harrassment and prejudicial enforcement of the law. But the Constitution does not forbid the application of common sense in the detection of crime and the apprehension of criminals.[22]
Mr. Justice Harlan, concurring specially in Terry v. Ohio[23] encapsulates the law which should be kept in mind in situations in which the police stop for interrogation a suspicious person on less than probable cause:
A police officer's right to make an on-the-street "stop" and an accompanying "frisk" for weapons is of course bounded by the protections afforded by the Fourth and Fourteenth Amendments. The Court holds, and I agree, that while the right does not depend upon possession by the officer of a valid warrant, nor upon the existence of probable cause, such activities must be reasonable under *38 the circumstances as the officer credibly relates them in court.
Terry v. Ohio was a unanimous opinion of the Supreme Court of the United States. It should not be taken as justifying police interrogation undertaken without specific reason. But on the other hand, it seems to us at least a strong possibility that in a case like this one the reasonable thing for a burglary detective to do is to stop a car thought to belong to a person formerly convicted of burglary, proceeding without lights, in the vicinity of a crime reported to be in progress. We leave the determination of the reasonableness of Cloud's conduct to the trial judge upon remand.
Reversed and remanded.
HOBSON, A.C.J., and McNULTY, J., concur.
NOTES
[1] Allison and Vess were also charged with vagrancy.
[2] 1970, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419, following Carroll v. United States, 1925, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. See also Dyke v. Taylor Implement Mfg. Co., 1968, 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538.
[3] E.g., Courington v. State, Fla. 1954, 74 So.2d 652.
[4] E.g., Smith v. State, Fla.App.2d 1969, 228 So.2d 613; Miller v. State, Fla.App.2d 1962, 137 So.2d 21 (car impounded, driver in hospital).
[5] E.g., Godbee v. State, Fla.App.2d 1969, 224 So.2d 441. See also Cooper v. California, 1967, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730. Cf. Preston v. United States, 1964, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777.
[6] E.g., Self v. State, Fla. 1957, 98 So.2d 333; Jackson v. State, Fla.App.3d 1966, 192 So.2d 78. See also Gray v. State, Fla.App.3d 1965, 177 So.2d 868.
[7] Annot., 10 A.L.R.3d 314, 322.
[8] "A purpose or motive alleged, or an appearance assumed, in order to cloak the real intention or state of affairs; excuse; pretense; cover; semblance." Webster's New International Dictionary of the English Language, 2d ed. 1957.
[9] 1886, 118 U.S. 356, 373-374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220.
[10] U.S.Const. amend. XIV.
[11] Other Florida cases involving seizure following traffic arrest: Longo v. State, 1946, 157 Fla. 668, 26 So.2d 818; Kersey v. State, Fla. 1952, 58 So.2d 155; Graham v. State, Fla. 1952, 60 So.2d 186; Burley v. State, Fla. 1952, 59 So.2d 744; Collins v. State, Fla. 1953, 65 So.2d 61; Brown v. State, Fla. 1953, 62 So.2d 348; Byrd v. State, Fla. 1955, 80 So.2d 694; James v. State, Fla. 1955, 80 So.2d 699; Ippolito v. State, Fla. 1955, 80 So.2d 332; Gaskins v. State, Fla. 1956, 89 So.

2d 867; Brown v. State, Fla. 1956, 91 So.2d 175; Cameron v. State, Fla.App. 1st 1959, 112 So.2d 864; Smith v. State, Fla.App.2d 1963, 155 So.2d 826; Beacham v. State, Fla.App.3d 1965, 175 So.2d 796; Riddlehoover v. State, Fla.App.3d 1967, 198 So.2d 651; Gagnon v. State, Fla.App.3d 1968, 212 So.2d 337; Smith v. State, Fla.App.2d 1969, 228 So.2d 613; Gustafson v. State, Fla.App. 4th 1971, 243 So.2d 615. See also Brinegar v. State, 1953, 97 Okla. Cr. 299, 262 P.2d 464; Note, Search and Seizure-Search Incident to Arrest for Traffic Violation, 1959 Wis.L.Rev. 347; Note, Interference with the Right to Free Movement: Stopping and Search of Vehicles, 1963, 51 Calif.L.Rev. 907, 921 et seq.
[12] See, e.g., State ex rel. Donnelly v. Teasdale, 1885, 21 Fla. 652; Ferlita v. Jones, 1905, 50 Fla. 218, 39 So. 593; Stephens v. Anderson, 1918, 75 Fla. 575, 79 So. 205; City of Miami v. Thigpen, 1943, 151 Fla. 800, 11 So.2d 300; Conrad v. Jackson, Fla. 1959, 107 So.2d 369; Wilkins v. Tebbetts, Fla.App.3d 1968, 216 So.2d 477; Town of Medley v. Caplan, Fla.App.3d 1966, 191 So.2d 449. The Florida Bar, Evidence in Florida (Florida Practice Manual No. 13, 1971), §§ 2.7, 11.4.
[13] Tipp v. Dist. of Columbia, 1939, 69 App. D.C. 400, 102 F.2d 264.
[14] Annot., 5 A. & E. Ann.Cas. 614 (1907). Cf. Annot., 111 A.L.R. 959 (1937).
[15] 9 Wigmore, Evidence, § 2573, at p. 558 (3d ed. 1940).
[16] Ibid. § 2572, at pp. 553-554.
[17] Laws of Florida, Special Acts of 1951, Ch. 27928.
[18] E.g., in Bay View Investments, Inc. v. Grisby, Fla.App.2d 1969, 219 So.2d 760.
[19] Cases and Materials on Evidence, at 75 (1965).
[20] Terry v. Ohio, 1968, 392 U.S. 1, 31, 88 S.Ct. 1868, 20 L.Ed.2d 889.
[21] Rios v. United States, 1960, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688; Wilson v. Porter, 9 Cir., 1966, 361 F.2d 412; United States v. Catalano (United States v. Swiatek) 7th Cir., 1971, 450 F.2d 985.
[22] Gustafson v. State, Fla.App. 1971, 243 So.2d 615; State v. Padilla, Fla.App. 1970, 235 So.2d 309; Chance v. State, Fla.App. 1967, 202 So.2d 825; Lowe v. State, Fla.App. 1966, 191 So.2d 303.
[23] Terry v. Ohio, supra.