297 So.2d 130 (1974)
STATE of Florida, Appellant,
v.
Albert B. RHEINER, Appellee.
Nos. 73-851, 73-854.
District Court of Appeal of Florida, Second District.
July 3, 1974.
Robert L. Shevin, Atty. Gen., Tallahassee, and Richard C. Booth, Asst. Atty. Gen., Tampa, for appellant.
*131 Joseph F. McDermott, of McDermott & Ohle, St. Petersburg, for appellee.
PATTON, ROBERT W., Associate Judge.
This is an interlocutory appeal from an amended order of the trial court granting the motion of the Appellee to suppress statements and tangible evidence and determining that the arrest, search and seizure of said Appellant was illegal and without probable cause. The Appellant had been charged by information filed by the State Attorney for the Sixth Judicial Circuit with breaking and entering a building in Seminole Lake Country Club Estates with the intent to commit a misdemeanor, to-wit petit larceny.
Testimony of the arresting officer was taken at a hearing upon the motion to suppress, a synopsis of which is as follows: the officer, an employee of the St. Petersburg Department of Safety, was driving a vehicle (presumably a police car) late at night in the City of St. Petersburg and observed the Appellee driving an automobile from the trunk of which a bicycle (or bicycles  there are references in the record to both bicycle and bicycles) was protruding: the officer followed the Appellee for a few blocks and then directed him to stop. The officer was then asked the following questions and gave the following answers:
"Q Why did you pull him over?
A For the simple fact at that time of night I considered that to be suspicious acts, to check him out why he had bicycles in the car.
Q You didn't have any knowledge a theft of the bicycles had occurred?
A No I didn't.
Then at a later point in his testimony, the officer gave the following answers:
"Q Officer Mullens, at the time you saw the defendant driving around with bicycles hanging out of the back of the car, I think you said this was late or an hour you were likely to be suspicious of his activity. What time was it?
A I believe it was about two or three o'clock in the morning.
Q And I believe you used the words, "I checked him out." Would you explain to the Court what you mean by "check him out"?
A Well, we have many B- and `E's and thefts and stuff in the city, and any time we see somebody with a motorcycle or a bicycle, or anything like that in a car, we automatically check them out; in other words, stop them to find out why they have it in the car at this hour of the night."
At another point thereafter appear the following questions and answers:
"Q Officer, you said  will you please recount what you did when you walked up beside the car?
A When I first approached him?
Q Did you ask him for some type of identification?
A Yes, sir, I asked him for his driver's license.
Q Is this routine?
A Yes, it is.
At the same time the officer asked for the driver's license he also asked the Appellee if the bicycles were his and Appellee replied that they were. The officer then went to his patrol car to run a record check on the driver's license, and on the way back, and without going inside the car, the officer saw a Pinellas Park license tag on a bicycle. He wrote that license number down and then ran a record check on the bicycle license tag and found that the bicycle had been stolen. The officer then asked the Appellee to step out of his car and walk back to the patrol car, "at which time he was read the rights of the *132 Miranda card" and was asked where he got the bicycles. The Appellee stated that he had purchased the bicycles in St. Petersburg, and he was then asked where he bought the license. Appellee replied that he bought the license in St. Petersburg, whereupon the officer asked him again where he got the bicycles and at the same time advised Appellee that he knew where the bicycles came from. At that point Appellee admitted taking the bicycles.
The police officer then transported Appellee to the St. Petersburg Police Department where he interrogated him. The following are further questions and answers from the testimony of the police officer on the Motion to Suppress:
"Q As I understand, he had already told you about taking the bicycles, is that right?
A Yes. May I bring something else up?
Q Yes.
A Okay. When I picked him up, I found a piece of paper in his pocket that listed all of these addresses.
Q All of these addresses?
A Yes.
Q And then you felt inclined to question him further, is that right?
A Yes.
Q At the fourth floor of the St. Petersburg Police Department?
A Yes."
* * * * * *
"Q You had certain addresses on a piece of paper you recovered from Mr. Rheiner?
A Yes.
Q Did you question him about those?
A Yes, sir.
Q How many were there all together you questioned him about?
A It was the ones on the piece of paper and some others he told me about.
THE COURT: Which ones were on the paper?
A The one to-day, there was the word `Commonwealth' written on the paper and he explained what this meant, the place where they had gotten the chandeliers and stuff in the County, and a place with different sized tires on it, and from what I gathered from Mr. Rheiner 
THE COURT: Officer, let me say this: We are not interested in what you gathered and what you thought. We want the exact words as closely as possible. If you can't remember the exact words, then give us the tenor of the conversation.
A Okay, he was asked what was on the paper, like the number, the different addresses for the bicycles, a couple of places where Mr. Rheiner was going to steal tires from, and I believe that was about it on the paper.
Q The charges involved today, they were on the paper; correct?
A Commonwealth, yes, sir."
It is clear from the testimony that the Appellee was advised several times of his constitutional rights, including the right to obtain counsel and to have him present.
The following is a portion of the testimony given by the Appellee at the hearing on the Motion to Suppress:
"Q Can you relate to the Court, please, what Officer Mullens told you prior to entering any interrogation as to offenses other than the bicycle?
A Well, he took me upstairs and started questioning me about the bicycles, where I got them.
Q The bicycles?
A Right.

*133 Q And you told him that; is that correct?
A Yes, and then he started questioning me if I did any other things, which I said no, and he brought out a book which had all of these addresses on it, and he said `There sure are a lot of places around where you live which have been broken in lately,' and I didn't tell him anything else except the bicycles, and he said, `Well, all you have to do is tell us about these and you will just be charged with the bicycles. All you have to do is clear up our records.'
Q Did you give him a statement as to any other offenses?
A No, I didn't, and he said, `Well, then, what about this?' And he brought out the paper.
Q You first told him about the bicycles?
A Right.
Q And then he said something about telling the other offenses and you would just be charged with the bicycles?
A Right.
Q Then did you give him a statement about the other offenses?
A Not until he brought out the paper. Then I thought well, he had the evidence."
We think there are two separate and distinct questions of law involved in this appeal. First, the validity of the arrest, and secondly, assuming the arrest to have been illegal, was the confession as to the offense for which Appellee was charged in this case so connected with the arrest as to render it inadmissible?
The trial court held the arrest to have been illegal and we agree. Here we have no semblance of a traffic violation, and the arresting officer did not contend that there was any such violation. Neither was this a case where the Appellee was unable to furnish a drivers license when the officer requested it. Likewise, Appellee was not driving a stolen automobile, nor did the arresting officer have any suspicion that he was. The officer was completely honest in stating his reason for stopping the Appellee in the first place, and that was because of the bicycle or bicycles protruding from the trunk of the car at the early morning hour of the arrest. The officer had no knowledge of any recent theft of bicycles in the area and so stated. Nothing could be clearer as to the officer's purpose than the following answer which he gave when questioned as to why he stopped Appellee in the first place:
"A For the simple fact at that time of night I considered that to be suspicious acts, to check him out why he had bicycles in the car."
It if further obvious from the officer's testimony that Appellee was under restraint (although not official arrest) at the time the officer got close enough to a bicycle to discover that it had a Pinellas Park license on it.
The factual basis for a claimed legal arrest in this case is not as strong as that in the case of Graham v. State, 60 So.2d 186, wherein the Supreme Court of Florida held the arrest to have been illegal. In the Graham case there was at least a charge of a traffic violation. Similarly, there was a charge of a traffic violation in the case of Riddlehoover v. State, 198 So.2d 651, wherein the District Court of Appeals, Third District, made the following statement:
"Where the primary purpose of an arrest appears to have been a pretext for making an unrelated, exploratory search of the defendant, or his car, the search is not justified."
A discussion of the word "pretext" as used in connection with arrests is contained in the decision of this Court in the case of *134 State v. Holmes, 256 So.2d 32, and we think that the facts of the present case constitute a good example of a situation where the arrest was a pretext for the seizure of property.
Perhaps most closely in point is the case of Byrd v. State, 80 So.2d 694 wherein a search of a truck suspected of containing moonshine whiskey was stopped without any semblance of a traffic violation. The Supreme Court held there was no probable cause for the arrest, and that the fruits of the illegal arrest could not be used against the driver. Interestingly, the Supreme Court stated that in the Byrd case there was no way to tell whether the whiskey found to be leaking from the truck was legal or illegal. It is suggested that here, without having stopped the Appellee for a closer inspection of the bicycle, there would have been nothing to place anyone on notice that bicycle might have been stolen.
The examination of the bicycle which revealed the Pinellas Park license, and the removal of the paper from the pocket of the Appellee in the police station both stemmed directly from the illegal detention and arrest of the Appellee and were the direct results thereof. All the testimony before the trial court indicates that the questioning of the Appellee concerning the offense for which he was charged in this case resulted from the use of the writing on said paper.
It is our opinion that the arrest of the Appellee was without probable cause and that the search of the Appellee which resulted in the police obtaining the piece of paper in question was likewise illegal. While this case is quite similar to that of State v. Outten, Fla., 206 So.2d 392 (District Court of Appeal, 197 So.2d 594) insofar as the facts leading up to the arrest were concerned, we think there was one vital difference. In the Outten case the driver was unable to produce a driver's license when requested by the police officer. This was likewise true in the case of Gustafson v. Florida, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (Supreme Court of Florida, 258 So.2d 1). This basic difference is the subject of the concurring opinion of Judge Mann in the case of Urquhart v. State, Fla., 261 So.2d 535.
The above conclusion as to the illegality of the arrest and search of the Appellee does not, however, necessarily dispose of the question of the admissibility of his confession of the offense in question. In the case of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, the United States Supreme Court held that where the connection between an illegal arrest and a statement made by the arrested person "become so attenuated as to dissipate the taint", the statement is admissible. In that case the statement in question was voluntarily made several days after the arrest and the release of the prisoner on his own recognizance. We have no such situation here. The arrest, the search in the police station resulting in the discovery of the piece of paper, and the confession of Appellee were all part of one continuous process, and for this reason we are of the opinion that the confession of the offense in question was inadmissible. The following language from the decision in the Wong Sun case is applicable:
"Thus, verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the `fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion. (citation) Nor do the policies underlying the exclusionary rule invite any logical distinction between physical and verbal evidence. Either in the terms of deterring lawless conduct by federal officers (citation); or of closing the doors of the federal courts to any use of evidence unconstitutionally obtained, (citation) the danger in relaxing the exclusionary rules in the *135 case of verbal evidence would seem too great to warrant introducing such a distinction."
For the reasons aforesaid, the Order of the trial court is affirmed.
McNULTY, A.C.J., concurs in conclusion only.
GRIMES, J., concurs.