498 So.2d 560 (1986)
STATE of Florida, Appellant,
v.
James KEHOE and Mickey De Vivo, Appellees.
No. 4-86-0279.
District Court of Appeal of Florida, Fourth District.
November 26, 1986.
*561 Jim Smith, Atty. Gen., Tallahassee, and Amy Lynn Diem, Asst. Atty. Gen., West Palm Beach, for appellant.
Harry Gulkin of Harry Gulkin, P.A., Fort Lauderdale, for appellees.
HERSEY, Chief Judge.
The state appeals the suppression of physical evidence. We reverse on findings that the stop which resulted in discovery of the cannabis at issue here was justified by a founded suspicion of criminal activity, and in any event was a valid traffic stop.
At 3:00 o'clock in the morning of the day in question, Lamar Williams, a Deerfield Beach police officer, observed a pickup truck, with a large boat trailer attached, parked at an intersection near a motel. He thought the presence of a truck and empty trailer at that location and hour unusual. He also observed that the license tag on the trailer was bent, making the number difficult to read.
At 5:45 a.m. Williams saw the same truck and trailer at the boat ramp in Pioneer Park, a Deerfield Beach city park which is open 24 hours a day. The truck was parked in a "no parking" zone as though ready to load an incoming boat. Williams saw a white male (later identified as De Vivo) standing next to the truck. Williams was suspicious because boats seldom pull into the park so early in the morning. He observed no further activity during the next hour.
At 6:45 a.m. Williams asked police dispatch to contact the department's vice officers to find out whether they wished to continue the surveillance. Vice officers Gary Null and Jeff Hurt arrived at about 7:00 a.m., and Williams reported his observations.
At 7:55 Null saw a boat approaching. De Vivo backed the trailer into the water. The boat was a 30-foot Scarab driven by Kehoe. As it entered the park it was creating a wake in a nowake zone. Also, Null noticed that Kehoe was looking all around as he approached the loading area and that the boat did not have any registration numbers on its side. Null was aware that on other occasions illegal drugs had been brought into Pioneer Park by boat.
Kehoe drove the boat directly onto the trailer and remained on board while De Vivo pulled it about 75 to 100 yards from the dock. Kehoe then climbed into the driver's seat of the truck and proceeded out of the park. Null thought it was unusual that Kehoe did not get out of the boat on the ramp and pull the plug to allow water to drain and that he failed to secure the boat before driving away. From his observations Null concluded that the boat was being used for drug trafficking. Also, he observed that the tag on the trailer was bent so that the last digit could not be read, which is a traffic violation.
Hurt's observations were consistent with Null's. In addition, Hurt stated that he observed three large containers of water, some large rocks, and several large bags of fertilizer in the back of the truck, which, in his opinion, were used to provide additional weight in the back to assist the truck in pulling a heavy load up the ramp.
As the truck and boat left the park, Null contacted Officer James Dusenbery, who was standing by, and asked him to stop the truck. As Dusenbery came up behind the trailer he could not read all of the numbers on the bent license tag. Dusenbery later testified that, although he stopped the vehicle primarily because of Null's instruction, he would have stopped it for the tag violation alone.
Kehoe gave Dusenbery a false name and was unable to produce a driver's license or registration. Null and Hurt arrived on the scene a short time later and discovered over 1,000 pounds of cannabis in the boat.
The Florida Stop and Frisk law, section 901.151, Florida Statutes (1985), provides in relevant part:

*562 (2) Whenever any law enforcement officer of this state encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, he may temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding his presence abroad which led the officer to believe that he had committed, was committing, or was about to commit a criminal offense.
As this court explained in State v. Stevens, 354 So.2d 1244, 1247 (Fla.4th DCA 1978):
Circumstances can "reasonably indicate" that a person "has committed, is committing, or is about to commit" a violation of criminal laws or ordinances without necessarily indicating that high probability of guilt which is implied by the term "probable cause." State v. Payton, 344 So.2d 648 (Fla.2d DCA 1977). To justify temporary detention, only "founded suspicion" in the mind of the detaining officer is required. Lewis v. State, 337 So.2d 1031 (Fla.2d DCA 1976); State v. Othen, 300 So.2d 732 (Fla.2d DCA 1974); State v. Ebert, 251 So.2d 38 (Fla.2d DCA 1971). A "founded suspicion" is a suspicion which has some factual foundation in the circumstances observed by the officer, when those circumstances are interpreted in the light of the officer's knowledge. "Mere" or "bare" suspicion, on the other hand, cannot support detention. Coleman v. State, 333 So.2d 503 (Fla. 4th DCA 1976). Mere suspicion is no better than random selection, sheer guesswork, or hunch, and has no objective justification. See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and Thomas v. State, 250 So.2d 15 (Fla.1st DCA 1971). There will be borderline cases, of course, in which reasonable men might differ as to whether the circumstances witnessed by an officer gave an objective foundation to his suspicion. Certain factors might then be evaluated to determine whether they reasonably suggested the suspect's possible commission, existing or imminent, of a crime: The time; the day of the week; the location; the physical appearance of the suspect; the behavior of the suspect; the appearance and manner of operation of any vehicle involved; anything incongruous or unusual in the situation as interpreted in the light of the officer's knowledge.
A stop by a police officer (Dusenbery) who is acting at the direction of another officer (Null) is valid so long as the officer giving the direction has observed sufficient activity to form the basis for a founded suspicion. See McClendon v. State, 440 So.2d 52 (Fla.1st DCA 1983); Crawford v. State, 334 So.2d 141 (Fla.3d DCA 1976). The relevant "founded suspicion" here is that of the officers who actually observed the activities of Kehoe and De Vivo  Null, Hurt, and Williams.
It is clear from applicable case law that mere presence of an individual at an unusual hour in an area where previous crimes had been committed is not enough to support a founded suspicion of criminal activity. See Mullins v. State, 366 So.2d 1162 (Fla. 1978) (officer saw defendant riding bicycle in early morning hours in residential area), cert. denied, 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979); State v. Beja, 451 So.2d 882 (Fla.4th DCA 1984) (vehicle parked near restaurant after 11:00 p.m. where there had been previous problems, and vehicle moved when officers approached), appeal dismissed, 469 So.2d 750 (Fla. 1985); Levin v. State, 449 So.2d 288 (Fla.3d DCA 1983) (defendant was observed walking along street at 3:00 a.m. in "high class" residential area that had experienced prior burglaries), aff'd, 452 So.2d 562 (Fla. 1984); Freeman v. State, 433 So.2d 9 (Fla.2d DCA 1983) (police saw defendant walk through parking lot where there had been recent auto break-ins carrying flashlight at 2:20 a.m.). The present case involves much more than the mere presence of Kehoe and De Vivo at an unusual, early morning hour in a location where illegal *563 drug trafficking had previously occurred. It is therefore necessary to determine the extent to which these additional observations constitute "founded suspicion."
In Carter v. State, 454 So.2d 739 (Fla.2d DCA 1984), two police officers observed the defendant and others sitting in a parked vehicle outside a lounge at 9:00 p.m., during the lounge's regular business hours. The occupants of the car were looking all around, and the officers saw the defendant bend down towards the seat. The officers believed defendant's movements to be consistent with ingesting cocaine. The appellate court reversed the trial court's denial of the defendant's motion to suppress, concluding that the stop was based on nothing more than a "hunch", which constitutes only "mere" or "bare" suspicion.
Denial of a defendant's motion to suppress was also reversed in Kayes v. State, 409 So.2d 1075 (Fla.2d DCA 1981), rev. denied, 424 So.2d 762 (Fla. 1982), a case cited in the order under review here. In Kayes the police observed boats and vehicles similar to the type used in drug smuggling operations at a dock, and similar vehicles were observed at a stained glass company's warehouse nine miles away. The warehouse was placed under surveillance. A car driven by appellant entered the warehouse at 4:00 p.m. and later exited, appearing to be weighted down. The officers followed and later stopped the car, discovering marijuana in the trunk. The appellate court concluded that the officers lacked a founded suspicion to make the stop because no actual connection had been made between the suspicious activity on the dock and the warehouse, and "from all appearances, the warehouse was part of a legitimate business operation." 409 So.2d at 1078. The mere similarity between the boats and vehicles at the warehouse to those typically used by drug smugglers was not sufficient to create a founded suspicion.
On the other hand, trial court orders granting motions to suppress were reversed in State v. Gray, 366 So.2d 137 (Fla.2d DCA 1979), and State v. Stevens, 354 So.2d 1244 (Fla.4th DCA 1978). In Gray a police officer observed a pickup truck pulling an empty flatbed trailer along a road in a farming area at about 8:00 p.m. The pickup attracted the officer's attention because it was driving very slowly, and on two occasions it made U-turns, retracing its route. The officer was aware of prior thefts of farming equipment in the area. The truck then stopped for a time, and from his vantage point the officer could not see any activity. When the truck passed him again, there was a tractor on the flatbed trailer. As the officer followed the truck it came to a stop, and a passenger exited and ran into a field. The driver was detained. The appellate court concluded that these facts supported a founded suspicion of criminal activity.
In Stevens a police officer patrolling near a city equipment yard at 11:00 p.m. saw a pickup truck leaving the area. He also observed fresh tire tracks beginning at the gate to the yard and proceeding in the direction the truck had taken. The officer thought it unusual for a truck to be in that location at that hour and was aware that wire had been stolen from the yard about a month before. Upon following the truck he saw coils of wire haphazardly piled in the bed, and the truck appeared to be badly overloaded. The officer then stopped the truck. The court held that the facts supported a founded suspicion of theft.
The observations relied upon here to support a founded suspicion of criminal activity were: the park's prior history of drug trafficking involving use of the boat ramp; the unusually early hour for a truck and trailer to be at the park to pick up an incoming boat; the long wait for the boat; the driver of the boat looking all around the area as he pulled in; lack of registration numbers on the boat; the heavy items in the back of the truck, which could have been placed there to assist the truck in pulling a heavy load up the ramp; and the highly unusual manner in which the boat was loaded onto the trailer and driven away, without draining the water or securing the boat. In our view, these factors *564 are much more suggestive of criminal activity than those observed in Carter, 454 So.2d at 739, or Kayes, 409 So.2d at 1075. On the other hand, they are somewhat less supportive of criminal activity than those in Gray and Stevens.
Thus, the present case falls between the two extremes, and, perhaps is most closely related to that line of cases which have held that, although each factor taken separately, or even viewed along with some but not all of the other factors, would not support founded suspicion, where all of the factors are taken together a founded suspicion of criminal activity is supported. An example of this genre of cases is State v. Lawson, 446 So.2d 202 (Fla.3d DCA), rev. denied, 453 So.2d 44 (Fla. 1984), in which the trial court's granting of a motion to suppress a firearm was reversed where the officer's stop of defendant's vehicle was based upon his observation of defendant driving slowly around a block four or five times at an early morning hour, and on the officer's knowledge that buildings in that block had been burglarized in recent months.
Similarly, in State v. King, 485 So.2d 1312 (Fla.5th DCA 1986), error was found on the part of the trial court in suppressing illegal drugs where the officer based his stop of the defendant's vehicle on a combination of the following factors:
1. The three occupants of the suspect vehicle "gawked" at the officer and turned their heads and looked at him as he passed.
2. The suspect vehicle was traveling very slowly and came to a stop as the officer's vehicle passed.
3. The suspect vehicle had a Dade County "Z" (rental) tag, possibly suggesting a vehicle engaged in drug activity. The officer explained that rental cars are often used in drug deals to avoid the risk of forfeiture.
4. The suspect vehicle stopped and parked at a bar known for drug dealing and prostitution.
5. The suspect vehicle was backed up to the rear door of the building, with the engine running, not in a normal parking space, and in a manner which would provide a quick exit.
6. One of the passengers of the vehicle had gone inside the bar while the others waited for him in the car.
Id. at 1314.
In Lawson and King, the activities of the defendants which the officers observed were not in themselves illegal; however, the cumulative effect of all of the unusual circumstances created a founded suspicion of criminal activity. The same may be said of the factors present in the instant case. We therefore hold that the trial court erred in finding that the officers lacked a sufficient basis to stop appellant's vehicle.
The state contends, alternatively, that even if the police officers lacked a founded suspicion as to drug trafficking, the stop was nevertheless valid as a traffic stop based upon the officers' observations of the bent trailer tag, which is a traffic violation. Appellant counters that, since the real reason he was stopped was because of the officers' suspicions of drug trafficking, rather than for the bent tag, the traffic stop would be invalid as a "pretext" stop.
In State v. Holmes, 256 So.2d 32 (Fla.2d DCA 1971), aff'd, 273 So.2d 753 (Fla. 1972), the second district promulgated a rule that a traffic stop is not invalidated by the presence of other motivations on the part of the officer so long as "the gravity of the traffic offense is such that any citizen would routinely be stopped for it if seen committing the offense by a traffic officer on routine patrol." Id. at 34 (emphasis added). The second district has continued to strictly follow this rule and thus to distinguish between more serious and less serious traffic offenses in determining whether a stop is a valid traffic stop in situations where the officer's primary motivation for the stop was suspicion of serious criminal activity. See State v. Gray, 366 So.2d 137 (Fla.2d DCA 1979) (missing taillight, tag light, or lack of clearance lights not sufficiently serious traffic violations to justify stop); Diggs v. State, 345 So.2d 815 (Fla.2d *565 DCA) (stop by officer to check driver's license invalid as "pretext" stop, though officer had reason to believe defendant did not have a license), cert. denied, 353 So.2d 679 (Fla. 1977); Urquhart v. State, 261 So.2d 535 (Fla.2d DCA 1971) (exceeding speed limit by 15 m.p.h. is sufficiently serious violation), cert. denied, 266 So.2d 349 (Fla. 1972). This court followed the Holmes rule in State v. Turner, 345 So.2d 767 (Fla.4th DCA 1977), in upholding a stop of the defendant's car for defective taillights and to check his driver's license, notwithstanding that the officers' subjective reason for stopping the defendant was that they had previously arrested him and knew him to be a convicted felon.
Gray, Diggs, and Turner illustrate a significant problem created by the Holmes rule: the likelihood of conflict between the districts as to what is or is not a sufficiently serious traffic offense to avoid the stop being characterized as a pretext stop. In Turner this court found that defective lights and a driver's license check were sufficient, but in Gray and Diggs these same violations were found not to be sufficient.
We also note that in a case which is substantially similar to the present case, Porchay v. State, 321 So.2d 439 (Fla.1st DCA 1975), overruled in part on other grounds, 403 So.2d 349 (Fla. 1981), the appellate court refused to find a valid traffic stop for a bent, partially illegible license tag because the officer's primary motivation for the stop was that he felt the occupants of the vehicle were "suspicious." But the same district court in an earlier case held that where Florida Highway Patrol officers were authorized by statute to require drivers to stop and display their drivers' licenses, "[t]he officer's motive for acting under the statute is immaterial, hence the fact that he is suspicious that the driver of a particular automobile may be committing a crime neither adds to nor detracts from his authority to stop the automobile and check the driver's license." Cameron v. State, 112 So.2d 864, 869 (Fla. 1st DCA 1959).
In Bascoy v. State, 424 So.2d 80 (Fla.3d DCA 1982), the third district broadened the Holmes rule in holding that "[w]here the defendants were stopped by an officer for minor traffic infractions of such a nature that any citizen committing them could have routinely been stopped, that the officer `possibly' would not have stopped defendants but for further suspicion that they were also engaged in criminal activity did not render it an unlawful `pretext' stop." Id. (emphasis added). And in State v. Ogburn, 483 So.2d 500, 501 (Fla.3d DCA 1986), the third district recently extended the rule still further in holding that where an officer observes a traffic violation and makes a stop, the stop "is not invalidated by the fact that an officer would not have stopped a defendant but for the suspicion that the defendant was involved in criminal activity."
We agree with the third district's reasoning in Ogburn and conclude that it is the better rule. First, as we previously observed, strict application of the Holmes rule creates the problem of courts being required to make highly subjective determinations as to which traffic offenses are sufficiently serious that a stop would routinely be made for them, and which are not. Also, it appears that if a police officer has actually observed a traffic violation (as opposed to fabricating one as an excuse to make a stop), he has the authority under the law to stop the driver committing the violation. There is no logical reason to abrogate that authority simply because the officer has other suspicions concerning the vehicle or the driver. Such concerns and motivations should not, and will not by this court, be considered relevant to the question of the officer's authority to make the traffic stop.
In the present case there is no question but that the bent tag obscuring one of the digits is a comparatively minor infraction which would not necessarily result in a stop. It is also undisputed, however, that the tag was bent and that this is a traffic infraction for which a police officer is authorized to make a stop. Therefore, we *566 conclude that, even if there had not been sufficient evidence of a founded suspicion of criminal activity to justify the stop, it could still be upheld as a valid traffic stop.
We therefore reverse the trial court's order granting appellant Kehoe's motion to suppress and remand for further proceedings.
REVERSED AND REMANDED.
ANSTEAD and WALDEN, JJ., concur.